# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA v. RENE LEONARD REBOLLO, Jr. | DOCKET **08-1826M** |
| | MAGISTRATE'S CASE NO. 08- |

Complaint for violations of Title 18, United States Code, Sections 1028(a)(7), Fraud and Related Activity in Connection With Identification Documents, Authentication Features, and Information, and 1030 (a)(2)(A), Fraud and Related Activity in Connection with Computers.

| NAME OF MAGISTRATE JUDGE **MARGARET A. NAGLE** | UNITED STATES MAGISTRATE JUDGE | LOCATION Los Angeles, CA |
|---|---|---|
| DATE OF OFFENSE | PLACE OF OFFENSE Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

FILED CLERK, U.S. DISTRICT COURT
JUL 31 2008
CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Between in or about May, 2008, to in or about July, 2008, in Los Angeles County, within the Central District of California, and elsewhere, RENE LEONARD REBOLLO, Jr., intentionally exceeded authorized access, and thereby obtained information contained in a financial record of a financial institution, in violation of 18 U.S.C. § 1030(a)(2)(A).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT OFFICIAL TITLE **RICHARD RYAN, FBI** |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) *Margaret A. Nagle* | DATE July 31, 2008 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54

CHRISTINE M. ADAMS:slm          REC:DETENTION (warrant)

# A F F I D A V I T

I, Richard P. Ryan, having been duly sworn, state:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") assigned to the Los Angeles Division. Since August 2003, I have been assigned to squads that investigate health care fraud, counterterrorism, gangs, drug trafficking, government fraud, and mortgage fraud. As a result of my experience, I am familiar with the federal laws relating to numerous violations.

## II. PERSONS TO BE CHARGED

2. This affidavit is made in support of a criminal complaint charging Rene L. Rebollo, Jr. ("REBOLLO"), with violating Title 18, United States Code, Section 1030(a)(2)(A) (Exceeding Authorized Access to the Computer of a Financial Institution), and Wahid Siddiqi ("SIDDIQI") with violating Title 18, United States Code, Section 1028(a)(7) (Fraud and Related Activity in Connection with Identification Documents).

## III. PROBABLE CAUSE

3. As a result of my participation in this investigation, I am familiar with the circumstances of the offenses described in this affidavit. This affidavit is being submitted solely to show that there is probable cause to believe that REBOLLO exceeded his authorized access to the computer of a financial institution, and

that SIDDIQI knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person with the intent to commit, and to aid and abet, and in connection with an unlawful activity that constitutes a violation of federal law, namely, Title 18, United States Code, Section 1030(a)(2)(A) (Exceeding Authorized Access to the Computer of a Financial Institution).

4. The facts set forth in this affidavit are solely for the purpose of establishing probable cause to charge REBOLLO and SIDDIQI, and do not reflect all of the evidence collected in this investigation to date. Interviews described herein are paraphrased and are set forth to the extent necessary to establish probable cause. They are not verbatim unless indicated by quotation. This affidavit does not purport to set forth all the facts that I have learned during the course of this investigation.

Confidential Witness 1

5. On May 20, 2008, Confidential Witness 1 ("CW1") told me the following:

    a. He had had contact with a Countrywide Home Loan employee who had provided various mortgage brokers and lead brokers Countrywide Home Loan data.

    b. CW1 met the Countrywide Home Loan employee in a

2

nightclub. An individual whom CW1 knew as "Nico" was also there. (I showed CW1 a California Department of Motor Vehicle photograph of SIDDIQI and CW1 identified the individual depicted in the photograph as the person he knew as Nico.)

  c. CW1 had been drinking while he was at the nightclub with Nico and the Countrywide Home Loan employee. CW1 remembered that other members of the group he was with at the nightclub referred to the Countrywide Home Loan employee as the "main cat."

  d. CW1 knew the Countrywide Home Loan employee only as "Rob Bello" or "Robello," from an e-mail address. CW1 provided what he remembered to be "Robello's" e-mail address. CW1 had no other contact or identifying information.

  6. Law enforcement records show that CW1 received at least the following convictions: in 1999, possession of marijuana for sale (a felony); in 1999, escape jail/etc. (a misdemeanor); and in 1998, obstruct/resist peace officer (a misdemeanor). Law enforcement records also show that the following bench warrants were issued for CW1 in 2003: two for failure to appear; one for false identification to a peace officer; and one for obstruct/resist officers. At least some of these bench warrants are still outstanding.

3

Countrywide Home Loan Security

7. I provided Countrywide Home Loan investigators the name "Robello" to search the Countrywide Home Loan employee databases for a current Countrywide Home Loan employee with that name. The Countrywide Home Loan investigators have told me the following:

a. There was a Countrywide Home Loan employee named Rene Rebollo.

b. REBOLLO was employed as a Senior Financial Analyst for Countrywide Home Loan's subprime mortgage division, Full Spectrum Lending, located in Pasadena, California.

c. REBOLLO had access to many Countrywide Home Loan databases in the scope of his employment, many of which contained sensitive information, such as social security account numbers of Countrywide Home Loan clients.

d. REBOLLO's regular work schedule was Monday through Friday, although REBOLLO had a habit of coming into his Pasadena workspace on Sunday afternoons and evenings. REBOLLO was paid a salary of approximately $63,000 annually, and did not earn any additional compensation for his Sunday activities.

e. When REBOLLO came to work on Sundays, he typically accessed various Countrywide Home Loan networks and databases for approximately one hour, logged off, and left Countrywide Home Loan premises.

4

  f. REBOLLO had received training regarding the company policy that no thumb drive or data storage device is permitted to be placed into any Countrywide Home Loan computer or computer system. This policy is intended to prevent the leak of Countrywide Home Loan data.

  g. Countrywide Home Loan is a home loan bank.

 8. On July 31, 2008, a member of Countrywide Home Loan's legal team informed me that, effective January 1, 2008, Full Spectrum Lending was made a part of Countrywide Bank, FSB, the deposits of which are insured by the Federal Deposit Insurance Corporation.

July 15, 2008 Interview of RENE REBOLLO

 9. On July 15, 2008, SA Medrano and I interviewed REBOLLO at his place of employment. We identified ourselves as FBI special agents and asked REBOLLO if he was willing to answer our questions. I advised REBOLLO that answering our questions was completely voluntary and that he was free to leave at any time. REBOLLO stated that he was willing to answer our questions, that he understood that answering our questions was completely voluntary, and that he was free to leave at any time. During the interview, REBOLLO told me the following:

  a. REBOLLO has been employed by Countrywide Home Loan for approximately nine and one-half years. REBOLLO's current

position with Countrywide Home Loan is as a Senior Financial Analyst, working in the Pasadena office.

      b.    Prior to working in the Pasadena office, REBOLLO worked in Countrywide Home Loan's Simi Valley offices in various positions. REBOLLO is paid a salary of $65,000 annually with a small bonus of approximately $2,000. REBOLLO's work schedule is Monday through Friday.

      c.    REBOLLO was responsible for a "security breach" at Countrywide Home Loan. He defined the meaning of a security breach as giving out Countrywide Home Loan company names, social security account numbers, telephone numbers, and other Countrywide Home Loan client records and data to a "third party."

      d.    REBOLLO ran reports on Countrywide Home Loan databases from Countrywide Home Loan computers at his workspace and saved the reports to personally owned flash drives, also known as thumb drives.

      e.    REBOLLO accessed several Countrywide Home Loan databases to collect this data, including databases called "AS400" and "Accuate." REBOLLO accessed the Countrywide Home Loan databases, downloaded the Countrywide Home Loan data, and saved the data to the flash drives typically on Sundays or during his regular working hours.

      f.    REBOLLO purchased the flash drives he utilized to

save the Countrywide Home Loan data from Best Buy, Target, and other stores. After REBOLLO saved the Countrywide Home Loan data on the flash drives, REBOLLO then left Countrywide Home Loan premises with the intent to sell the data.

   g. REBOLLO downloaded and sold the Countrywide Home Loan data to a third party "a lot." REBOLLO estimated that he downloaded approximately 20,000 Countrywide Home Loan customer profiles every week for approximately two years. REBOLLO would sell 20,000 Countrywide Home Loan profiles for $500.

   h. REBOLLO opened a Washington Mutual account under the following name: Rene Rebollo, Doing Business As: RR Consulting. REBOLLO opened the business account specifically for the purpose of depositing and holding the proceeds of the Countrywide Home Loan data sales. REBOLLO estimated that he profited approximately $50,000 to $70,000 in total from the sales of the Countrywide Home Loan data over the course of two years.

   i. After leaving Countrywide Home Loan premises with the data on a flash drive, REBOLLO either sold the flash drive directly to another individual or e-mailed them the contents of the flash drive.

   j. REBOLLO initially said he e-mailed the contents of the flash drive from a public computer at a Kinko's, located near the intersection of Colorado and Lake, Pasadena, California.

REBOLLO said he e-mailed from Kinko's because it was safer to do so than from a public computer. REBOLLO later stated that he had actually e-mailed the Countrywide Home Loan data from his personal computer at his residence in addition to the e-mails he sent from Kinko's.

  k. Often, REBOLLO was requested by other individuals to obtain specific types of data from Countrywide Home Loan. For example, REBOLLO was asked for "portfolio leads" or "new declines." REBOLLO was able to accommodate such requests and provide the information because REBOLLO had access to many of Countrywide Home Loan's databases for Countrywide Home Loan clients all around the United States.

  l. REBOLLO knew that most Countrywide Home Loan computers had a security feature which disabled the access and use of flash drives. This was a security feature implemented to avoid Countrywide Home Loan data leaks.

  m. Countrywide Home Loan provided e-mail notifications and training about security policies regarding lead sources, and REBOLLO knew what he was doing was wrong.

  n. One computer that REBOLLO had access to did not contain the Countrywide Home Loan security features that disabled flash drive access. REBOLLO took advantage of the unsecured computer and used it to download and save the Countrywide Home

Loan data to a flash drive.

o. I showed REBOLLO a California Department of Motor Vehicle photograph of SIDDIQI. REBOLLO claimed that he did not know the individual in the photograph.

10. A Countrywide Home Loan investigator informed me that Countrywide Home Loan prohibited its employees from accessing its computers to obtain Countrywide Home Loan data for any reason other than for Countrywide Home Loan business purposes fitting within the particular employee's job functions. The investigator also told me that Countrywide Home Loan employees received training and notifications regarding this policy.

Confidential Witness 2

11. On July 7, 2008, Confidential Witness 2 ("CW2") engaged in a series of consensually recorded telephone conversations with SIDDIQI, whom CW2 knew only as "Nico."

12. CW2 told me that he had met "Nico" on a prior occasion when Nico and another individual sold CW2 leads.

13. During the recorded telephone call, CW2 placed an order with Nico for several thousand leads. CW2 negotiated the price of $4,000 for the data. During the call, a meeting was set for Wednesday, July 9, 2008, at 10:30 a.m. to purchase the data.

14. On the morning of July 9, 2008, CW2 was equipped with an audio and video recording device. The recording device was

used to record the meeting with SIDDIQI. CW2 was also provided with $4,000 in United States currency, from the FBI, to purchase the Countrywide Home Loan data from SIDDIQI.

15. Shortly after the transaction occurred, CW2 told me the following about it:

    a. SIDDIQI arrived at approximately 11:30 a.m. on July 9, 2008, at the predetermined meeting place.

    b. SIDDIQI produced two compact disks for CW2's review. CW2 opened and turned on an FBI undercover laptop computer and placed each disk in the laptop computer for review. CW2 opened several spreadsheets contained on the disks.

    c. CW2 told me he saw, among other things, several thousand social security account numbers.

    d. After reviewing the data, CW2 told me he gave SIDDIQI $4,000 in cash for the disks.

    e. After a brief conversation, SIDDIQI and CW2 left the meeting location.

16. I met CW2 immediately after the meeting at a predetermined location and retrieved the laptop with a compact disk still in the disk drive, as directed. The other disk was in the computer bag which held the undercover laptop computer.

17. I listened to the audio recording of CW2's telephone calls and subsequent meeting with SIDDIQI and heard the

following:

    a. CW2 asked SIDDIQI if the leads were "fresh from Countrywide." SIDDIQI answered, "Yes."

    b. SIDDIQI told CW2 that he was just on the phone with his "guy."

    c. SIDDIQI said the leads "will have full socials." SIDDIQI later reiterated that the leads have "socials."

    d. SIDDIQI told CW2 that he (SIDDIQI) has "the bombest leads."

    e. SIDDIQI told CW2 that he gets the Countrywide leads. SIDDIQI later reiterated that the leads were "fresh ones" and that they were from Countrywide.

18. FBI special agents positioned inside the location where the meeting between CW2 and SIDDIQI took place identified SIDDIQI and watched him meet with CW2. The agents saw CW2 open a laptop computer and converse with CW2.

19. Law enforcement records show that CW2 was convicted in 2008 of health care fraud and conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1347 and 371 (both felonies); in 1997 of driving under the influence, driving with a suspended license, and hit and run (property) (all misdemeanors); and in 1996 and 1994 of battery (both misdemeanors).

Review of Evidence Purchased From SIDDIQI

    20. On July 9, 2008, I reviewed the contents of the compact disks which CW2 purchased from SIDDIQI. When I opened the contents of the disks, I saw several spreadsheets in Excel format. Upon opening the Excel spreadsheets, I observed large quantities of names associated with several columns of numeric data. These columns contained telephone numbers, names, and social security account numbers, among other data. Each spreadsheet contained thousands of lines of data. I estimate that the disks contained identifying information for approximately 38,000 individuals.

    21. Copies of the spreadsheets on the compact disks purchased from SIDDIQI were provided to Countrywide Home Loan investigators for verification and authentication. Countrywide Home Loan investigators confirmed to me that the data belonged to Countrywide Home Loan. Countrywide Home Loan investigators told me that the social security account numbers associated with the names on the speadsheets were the actual social security account numbers belonging to Countrywide Home Loan account holders. Countrywide Home Loan investigators told me that the data referenced on the spreadsheets corresponded to Countrywide Home Loan client records.

## IV. CONCLUSION

22. Based on the foregoing and on my expertise, training and experience, I believe that there is probable cause to believe that Rene L. Rebollo, Jr. violated Title 18, United States Code, Section 1030(a)(2)(A) (Exceeding Authorized Access to the Computer of a Financial Institution), and Wahid Siddiqi ("SIDDIQI") violated Title 18, United States Code, Section 1029(a)(5) (Fraud and Related Activity in Connection with Access Devices).

_____
RICHARD P. RYAN
Special Agent - FBI

SUBSCRIBED TO AND SWORN before me
this 31st day of July, 2008

_____
HONORABLE MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE

13